UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF REGINALD ROSS,<br><br>    Plaintiffs,<br><br>v.<br><br>M/V STUTTGART EXPRESS, ET AL,<br><br>    Defendants.<br>_____/ | Case No. C-08-03989 JCS<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br>**[Docket No. 65]** |

## I. INTRODUCTION

This maritime action involves allegations that a shipowner is responsible for the death of longshoreman, Reginald Ross, who was fatally injured aboard the M/V Stuttgart Express while it was docked in Oakland, California. The wife of Reginald Ross, Glenda Ross, and their minor children, Gloria and Reyann Ross, and the estate of Reginald Ross (hereafter "Plaintiff") has filed suit under section 5(b) of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 905(b), alleging negligence of the shipowner, which caused the death of Reginald Ross. Defendants bring a Motion for Summary Judgment ("the Motion") seeking dismissal of all of Plaintiff's claims. All parties have consented to the jurisdiction of a United States magistrate judge, pursuant to 28 U.S.C. § 636(c).[1] For the reasons stated below, Defendants' Motion is DENIED.

---

[1] Although the ship has been sued *in rem*, it has never been arrested and the parties agree that it is not a party to this lawsuit. JSUF No. 2. The parties further agree that at the time of the relevant facts in this case, the M/V/ Stuttgart Express was owned and operated by Hapag-Lloyd Aktiengesellschaft ("Hapag-Lloyd AG"), a shipowner based in Hamburg, Germany. *Id.* Defendant Hapag-Lloyd (America) is a United States Company located in Piscataway, New Jersey. *Id.* The Hapag-Lloyd Defendants will be referred to hereafter as "Defendants."

## II. BACKGROUND

### A. Facts

This action arises out of events that occurred on September 24, 2007 aboard the M/V Stuttgart Express, (hereafter "the vessel") which was docked at the Stevedoring Services of America ("SSA") container terminal in Oakland, California. Joint Statement of Undisputed Facts ("Joint Statement"), No. 4. Reginald Ross was employed as a longshoreman, working for SSA at the time of the incident. *Id.* Mr. Ross was not employed by any of the Defendants. *Id.* at 5. At the time of the relevant events, Mr. Ross was assigned to a "lashing gang" and was lashing containers after they had been loaded onto the vessel. Motion at 2.[2]

Although there are no eyewitnesses to what precipitated the containers to start swaying and striking Mr. Ross, causing his death, the parties agree that a container did in fact break loose while the stevedore's crane was attached to a container. Reynolds Decl., at ¶ 8. The accounts of the parties about the events that day differs, however. The apparent sole eye witness to the accident, Twanisha Watkins, Mr. Ross' lashing partner, has submitted a declaration in which she states that Mr. Ross had been in the catwalk area in front of a stack of two containers at the time of the accident. She describes her view of Mr. Ross immediately before the accident as follows:

> I was sitting off to the side, a couple of containers away from him, on his left side. I was getting ready to finish lashing for the day. . . I was walking toward Reggie, and Darrell Ford was walking up the stairs toward the platform. I just turned around and all of a sudden it just happened. Reggie had been down in the catwalk area and was standing in front of a bottom container that was going crazy and swaying. There were two containers stick together, on top of each other, and I could see the cords that were connected from the crane to the top container."

Declaration of Twanisha Watkins ("Watkins Decl."), ¶ 5. Ms. Watkins observed that the "top container looked to be locked to the bottom container, but the bottom container never locked to the deck" and that the bottom container was lifted off the ground and hit Mr. Ross in the pelvic and torso area. *Id.*, ¶ 6. Ms. Watkins saw that the container continued swaying, knocking Mr. Ross repeatedly. *Id.* He was knocked to the ground, but still alive. *Id.* It took over 45 minutes for any

---

[2]This fact is undisputed, as indicated by Plaintiff in his opposition. Opp. at 2. Plaintiff and Defendant have agreed to very few facts in their joint statement of undisputed facts, yet in its opposition brief, Plaintiff indicates that several facts in Defendants' motion are undisputed.

emergency medical help to arrive. *Id.*, ¶ 8. With respect to where Mr. Ross was standing at the time of the accident, Ms. Watkins declares that "the lashers were working a couple of containers away from the containers being loaded; we all stand 1 or 2 containers away. All lashers know the 5 container rule but no one in this industry follows it because lashers feel pressure to work quickly; we are trying to beat the clock. The supervisors know how fast everyone was working. The ship's officers know we have to load in the time they give us." *Id.*, ¶ 10.

Defendants respond that "the undisputed evidence" shows that Mr. Ross was working in violation of Pacific Coast Marine Safety Code Rule 1513, which provides:

> Employees shall not walk or work in the aisles adjacent to a container bay being loaded or discharged, except when the uppermost tier is being worked. Employees lashing or unlashing while the uppermost tier is being worked shall maintain a minimum awthwartship distance of five (5) container widths or half the width of the tier, whichever is greater, offshore.

Defendant states that "Mr. Ross was working directly under an active container crane in Bay 18 when the incident occurred." Motion at 2.

According to Plaintiff's expert, Zachary M. Reynolds[3], Mr. Ross was killed after he was struck repeatedly by the forward inboard corner of the bottom container, which broke loose when the shore side crane applied a lift to the top container, causing the rear of the bottom container to lift off of the aft sockets. Declaration of Zachary M. Reynolds ("Reynolds Decl.") at ¶¶ 5, 6, 8. The front of the bottom container was connected to the forward deck sockets. *Id.* at ¶ 12. Mr. Reynolds explains the incident in greater detail as follows:

> The crane operator pressed the lift button to "come up slow." The operator observed that "when it did come up, . . .it . . .kinds like jerked." The operator then "immediately . . .let the handle go." Instead of coming loose, the attachments held and exerted a lifting force on the

---

[3]Defendants object to the introduction of Mr. Reynolds' report as evidence on summary judgment on the ground that Mr. Reynolds is not qualified to render an expert opinion in this case because he is a naval architect and not a metallurgist. Reply at 7 (*citing* FRE 702, 703). The Court overrules this objection. Federal Rule of Evidence 702 "contemplates a broad conception of expert qualifications. . . the expert may be qualified either by 'knowledge, skill, experience, training, or education.'" *Thomas v. Newton Int'l Enterprises*, 42 F.3d 1266, 1269 (9th Cir. 1994) (reversing district court grant of summary judgment in favor of shipowner, due in part to district court's improper exclusion of expert report). Here, Mr. Reynolds, although not a metallurgist, has over forty years worth of experience as a naval architect and ship designer, following several years as a merchant ship officer upon his graduation from the United States Merchant Marine Academy in 1962 with a Bachelor of Science in Nautical Science. The Court concludes, at least for the purposes of summary judgment, that this education and experience lays the foundation sufficient for him to render opinions in this matter.

>   top container.  This lift was transmitted to the bottom container.  As it was, the bottom container only had the two fwd sockets connected, so the aft end of the container lifted and the fwd [sic] end remained in place.  This caused an eccentric load to be placed upon the crane's lifting gear.  The crane operator got a red light as a result of the lift and the crane paused because the loads on the attachment were eccentric.  The lift of the aft end of the container stack created a rearward draw upon the stack, causing the portside outboard-forward connection to slide aft and for the stack to rotate counter-clockwise.  Simultaneously, the inboard-forward connection failed, relieving the tension on the cargo falls at that corner and the eccentricity, so that the red light went off.  The stop or bolt on the sliding prot-forward (outboard) connector failed.  With two connections failed, and the container stack suddenly loose, it began to gyrate at the end of the suspending cargo falls, striking Plaintiff several times which apparently caused his death.

Reynolds Decl., ¶ 13.

According to Plaintiff, the vessel was not maintained or inspected properly and that Defendants were negligent in this regard.  Plaintiff has submitted evidence that the failed twist lock portion of port (inboard)-forward connection was defective, and that its failure was a contributing cause of the accident.  Reynolds Decl., ¶¶ 20-23.  Plaintiff has also submitted evidence that the starboard-forwarding (outboard) sliding socket assembly was defective and that its failure also contributed to the accident.  *Id.* at ¶¶ 24-25.  Plaintiff has submitted evidence that longshoremen observed that the lashing gear aboard Hapag-Lloyd ships was rusty, defective, worn and maintained with nonstandard, unrated parts, (Clay Decl., ¶ 7) and two witnesses who state that the equipment aboard the M/V Stuttgart express was old and rusty (Watkins Decl. ¶ 11) including twist locks that were "broken, rusty, bent and cracked."  Smalling Decl., ¶ 8; *see also* Reynolds Decl., ¶¶ 21-25.[4]

Mr. Reynolds concludes that in order for the crane to have caused the stack of two containers to break loose from the deck if none of the connectors was defective (as Defendants claim), the crane would have had to overcome 212 metric tons, or over three times the safe working limit of the crane.  Reynolds Decl., ¶ 16.  Based upon the fact that the load that day weighed only 52

---

[4]Defendants object to these declarations on the grounds that these witness statements lack foundation and are irrelevant as they pertain to Hapag-Lloyd ships generally, rather than the vessel at issue in this case, on the day in question.  The Court agrees in part.  To the extent that the witnesses have submitted statements that do not relate to the M/V Stuttgart Express on the date of the accident in this case, those portions of the declarations will not be considered by the Court.  However, three of the witnesses, Watkins, Smalling and Reynolds have submitted declarations that contain statements as to the condition of the vessel in this case, the M/V Stuttgart Express. See e.g., Watkins Decl., ¶ 11 ( "all of the ship equipment aboard the Stuttgart Express was old and rusty.  We just worked with the parts anyway.").  The Defendants' objections to the portions of the declarations submitted by Plaintiff that pertain to the condition of the equipment aboard the M/V Stuttgart Express are overruled.

4

1 metric tons (according to the cargo stow plan for the day), and based upon his visual inspection of
2 the relevant connectors, Mr. Reynolds concludes that in his opinion, defective connectors were the
3 cause of the accident that killed Mr. Ross, not the operation of the crane by the stevedores at port:
4 "The inescapable conclusion. . .is that the port (inboard)-forward TL failed substantially below its
5 rated capacity and was therefore deficient (defective)." *Id.*, ¶ 20. Mr. Reynolds opines that the
6 condition of the failed port (inboard)-forward TL was apparent in that it showed clear visual
7 evidence of a brittle fracture. Mr. Reynolds explains that these defects and cracks in the TL would
8 be visible to a competent mechanic on inspection. *Id*., ¶ 22. Mr. Reynolds also inspected the second
9 failed connection assembly, the port-forward (outboard) connection and concludes that it was
10 similarly defective. *Id.*, ¶ 24. He states that the rail stop for the connection was "jerry-rigged" in
11 such a way that it was not adequate for its intended purposes. *Id.,* ¶ 25.

12 Defendants' expert, Gordon Lasko, reaches the opposite conclusion, opining that "the shaft
13 appeared to have been broken because of excessive stress placed on the shaft consistent with a
14 container crane forcibly lifting a container attached to the twist lock" and that "none of the elements
15 of the twist lock or the sliding sockets appeared to be defective in any manner, other than the fact
16 that the broken shaft of the twist lock exhibited features characteristic of an overload." Declaration
17 of Gordon Lasko ("Lasko Decl."), ¶¶ 3-4.

18 The parties also dispute the facts surrounding who is responsible for supervising
19 longshoreman who are lashing aboard docked ships. Plaintiff maintains that the ship owners and
20 crew have some responsibility for supervising the loading and unloading of cargo and certainly,
21 have the responsibility to inspect the condition of the ship. Opp. at 3. With respect to supervision,
22 Plaintiff contends that the Hapag-Lloyd crews have the right and power to control the timing of
23 loading operations and to supervise the loading operations of the ships, and observe the stevedores
24 as to the "five container rule." *Id.* Plaintiff has submitted evidence that "Hapag-Lloyd knowingly
25 set a loading rate that could not be met if the lashers observed the "five container rule." Clay Decl.,
26 ¶¶ 3-6; Smalling Decl., ¶ 5-7 ('Hapag-Lloyd does not give enough time to load and follow the 5
27 container rule."), Reynolds Decl., ¶ 28 ("In my experience, the sailing time of a vessel is set by the
28 Captain and the Chief Cargo Mate . . . [t]hese ships officers have the power and reason to slow or to

accelerate loading operations."). Plaintiff argues that "ship's officers customarily observe the loading of any cargo vessel of the class of M/V Stuttgart Express while loading . . . because the cargo must be loaded properly, or it will put the ship and its crew at risk of dangerous instability in heavy weather. It is more likely so than not that the ship's deck officers observed the LHW crew loading within five container lengths of the crane loading the containers in question, stood by, and did not intervene and enforce Article 4 – Safety of the agreement . . . between Defendants and SSA whereby the ship was contractually bound to enforce the Pacific Marine Safety Code Rule 1513 for the safety of the LSHW crew." Opp. at 4 (citing Container Stevedoring and Service Agreement between Hapag-Lloyd (America), Inc., et al, and SSA Terminals, LLC, Bates Nos. HAP AG 000305; *see also*, Declaration of Reed S. Morgan, and attached excerpts from the deposition of Bernd Marquardt, Hapag-Lloyd's Manager of Marine Operations at p.3, lines 29-43) (Q: "So your testimony is the chief officer is responsible for the supervision of cargo operations, which shall ensure that all safety aspects are adequately taken into account, meaning freeboard, right? A: Yes.").

Defendants maintain that the ship owners do not supervise the stevedores. Rather, Defendants have submitted evidence that longshoremen are supervised by SSA, employed by SSA, and that shipowners do not supervise the unloading and loading of cargo aboard docked container ships. *See* Declarations of Warren MacQuarrie ("MacQuarrie Decl.") ¶ 5. Defendants have also submitted evidence that the ship's crew in this case was not involved in any way with the stevedoring operations and none was present when the accident occurred. Declaration of Denis Hans Meir ("Meir Decl.") ¶ 3; Declaration of Nelson Masungsong ("Masungsong Decl."), ¶ 3.

Finally, Defendants introduce the investigative report prepared by OSHA after the accident, which cited Mr. Ross' employer, SSA (and *not* Hapag-Lloyd), as a result of this incident, based upon SSA's failure to ensure that its employees were adhering to the "five container rule." Declaration of John Giffin ("Giffin Decl."), Exh. B.[5]

---

[5] Plaintiff objects to the use of the report on the grounds that post-accident investigative reports are inadmissible on summary judgment. Defendants do not respond to this argument in their reply, apparently conceding the impropriety of introducing the OSHA report. The Court sustains Plaintiff's objections to this report, to the extent those objections are directed at the agency's *legal* conclusions. *See Sullivan v. Dollar Tree Stores,* 623 F.3d 770777 (9th Cir. 2010) (legal conclusions of agency

**B.  The Complaint**

In the Complaint, Plaintiff asserts a claim under the Longshore Harbor Worker's Compensation Act for the negligence of the shipowner, Hapag-Lloyd Aktiengesellschaft and Hapag Lloyd (America) Inc., in the death of Reginald Ross.

**C.  The Motion**

In the Motion, Defendants seek summary judgment on the following grounds:

1)  Defendants did not breach their "turnoverduty" owed to Plaintiff.

2)  Defendants did not breach their duty to intervene;

3)  Defendants did not breach any duty of active control; and

4)  Reginald Ross' own conduct in violating the "five container rule" was the cause of the accident not any negligence on the part of the shipowner, and the shipowner had no duty to supervise Mr. Ross in the exercise of his lashing duties aboard the M/V Stuttgart Express.

In their Opposition, Plaintiff asserts that there are disputed questions of material fact, which precludes summary judgment and that granting summary judgment in cases brought by longshoremen (or their estates, as is the case here) under the LHWCA is rare.  Plaintiff also argues that any claim that Mr. Ross' own conduct caused the accident is inappropriate for determination on summary judgment.  Plaintiff does not oppose the Defendants' motion with respect to the breach of the active control duty.

**III.  ANALYSIS**

**A.  Legal Standards**

**1.  Summary Judgment Under Rule 56(c)**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A "genuine"

---

investigative reports are not facts admissible on summary judgment).

7

issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the nonmoving party's claim, or to a defense on which the nonmoving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Nissan Fire & Marine Ins. Co. v. Fritz Cos. Inc.*, 210 F.3d 1099 (9th Cir. 2000). Once the movant has made this showing, the burden shifts to the party opposing summary judgment to "designate specific facts showing there is a genuine issue for trial." *Celotex*, 477 U.S. at 323. To establish a "genuine" issue of fact when opposing summary judgment, a plaintiff must "produce at least some significant probative evidence tending to support" the allegations in the complaint. *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990).

### 2. Legal Standard – Claims under the Longshore and Harbors Workers' Compensation Act

The Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 905(b), ("LHWCA") establishes a comprehensive workers' compensation program for longshoremen and their families. Section 5(b), the provision of the Act relevant to the present case, provides longshoremen a cause of action for injuries resulting from the negligence of a ship or its crew.[6] The Act neither specifies what acts constitute negligence nor describes the duties owed by shipowners to longshore workers. Rather, Congress intended that the scope of a shipowner's liability would evolve under general common law principles. *See Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 165-66 (1981).

In *Scindia Steam Navigation Co.,* the Supreme Court set forth the basic framework under the Act. "This duty extends," the Court explained, "at least to exercising ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operation with

---

[6]Section 5(b) provides in pertinent part: "In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel...." 33 U.S.C. § 905(b).

8

reasonable safety to persons and property...." *Id.* at 166-67. As articulated in *Scindia* and developed further in subsequent cases, the LHWCA imposes three duties on shipowners: (1) the "turnover" duty; (2) the "active operations" duty; and (3) the "intervention" duty. The turnover duty comprises both a duty to provide safe conditions in instrumentalities and areas "turned over" to the stevedore's control and a corollary duty to warn of "any hazards on the ship or with respect to its equipment" so long as the hazards are "known to the vessel or should be known to it in the exercise of reasonable care" and "would likely be encountered by a stevedore in the course of his cargo operations" and would "not be obvious to or anticipated by him if reasonably competent in the performance of his work." *Scindia Steam, supra* at 167. Thus, absent actual knowledge of a hazard, the shipowner's duty to warn "may attach only if the exercise of reasonable care would place upon a shipowner an obligation to inspect for, or discover, the hazard's existence." *Howlett v. Birkdale Shipping Co.*, 512 U.S. 92, 100 (1994) (*citing Kirsch v. Plovidba*, 971 F.2d 1026, 1029 (3d Cir. 1992) ("[T]he shipowner's duty to warn the stevedore of hidden dangers necessarily implies a duty to inspect to discover those dangers.")).

For areas and instrumentalities remaining under the ship's control, the active operations duty includes the turnover duty, but also requires the ship, after unloading has begun, not to take negligent actions in areas under its control that threaten the longshoremen's safety. *See Davis v. Portline Transportes Maritime Internacional*, 16 F.3d 532, 537 (3d Cir.1994). Finally, the duty to intervene requires the ship to take affirmative steps to rectify hazardous conditions even though it did not create the danger and even though the danger did not exist at the point of "turnover," at least when the ship has actual knowledge and the condition is not obvious. *See Howlett v. Birkdale Shipping Co.*, 512 U.S. 92, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994). The present case involves disputes surrounding two of the *Scindia* duties: the "turnover duty" and the duty to intervene.

### 3. Application of the Law to the Facts of the Case

#### a. The "Turnover duty" – An Unreasonably Unsafe Condition

The turnover duty relates to the condition of the ship when it is turned over to the stevedores. One of the main duties of a shipowner is to turn over the vessel to the stevedore in a reasonably safe condition. *Thomas v. Newton Int'l. Enterprises*, 42 F.3d 1266, 1269 (9th Cir. 1994) (citing *Scindia*,

451 U.S. at 167). As the Ninth Circuit has explained: "Generally, this type of issue is inappropriate for resolution at the summary judgment stage. 'Summary judgment is rarely granted in negligence cases. Whether the defendant acted reasonably is ordinarily a question for the trier of fact.'" *Id.* at 1269.

In the present case, Plaintiff has presented evidence from an expert witness regarding the hazardous condition of the vessel. Mr. Reynolds opines that the condition of the ship was unreasonably dangerous in that several key components were defective and that these defects caused the accident in this case, not the operation of the crane by the stevedores. *See* Reynolds Decl., ¶¶ 12-20. "Expert opinion evidence is itself sufficient to create a genuine issue of disputed fact sufficient to defeat a summary judgment motion." *Thomas v. Newton Int'l. Enterprises*, 42 F.3d 1266, 1270 (9th Cir. 1994) (citations omitted). If the plaintiff can show that the parts necessary to secure cargo were in disrepair, the jury is entitled to draw from that evidence the reasonable inference that the connectors presented a generally hazardous condition.

Defendants argue that at the time of the accident in this case, the undisputed evidence shows that Mr. Ross was standing underneath an active container and that because his conduct violates the "five container rule," summary judgment is appropriate. The Court disagrees. In essence, the Defendants' argument amounts to an argument that any unreasonably unsafe condition on the ship was avoidable, *i.e.*, that if Mr. Ross had been standing farther away from the dangerous condition in compliance with the rules, then he would not have been injured and killed. Whether a hazardous condition is so easily avoidable or easily rectifiable such that it could not constitute an unreasonably dangerous condition is a matter that "must be factually evaluated on a case-by-case basis." *Thomas,* 42 F.3d. at 1271.

Defendants argue that the evidence submitted by Plaintiff shows that the hazards aboard the vessel in this case (*i.e.*, rusty parts) were known to the longshoremen and thus easily avoidable. The Court is not persuaded by this argument. It is difficult to imagine how a longshoreman lashing containers in the port of Oakland would be able to conduct his lashing duties, avoiding rusted, brittle and cracked connectors, which serve to secure the cargo containers in place. Even if the longshoremen were aware that many parts aboard Hapag-Lloyd ships were old or rusted, the Court

10

1 cannot as a matter of law conclude that Mr. Ross would, through the exercise of reasonable caution,
2 have anticipated that the connector sockets would break as he was performing his lashing duties.
3 Such a determination is inappropriate at the summary judgment stage.

4 　　　　Defendants argue that because witnesses have submitted declarations that the parts aboard
5 the vessel were rusted and poorly maintained, that this somehow absolves the shipowner of liability
6 because Plaintiff now concedes that any hazardous conditions were open and obvious to the
7 longshoremen. Thus, under the Supreme Court's refinement of the turnover duty in *Howlett, supra*,
8 as the turnover duty pertains specifically to the cargo area of the ship, the Defendants are not liable
9 because their duty to warn of hazardous conditions does not extend to dangerous conditions that are
10 known to the stevedore. As one district court has observed, "[a] fair reading of these opinions
11 [*Scindia, Howlett, supra*] compels the conclusion that the open and obvious defense is applicable to
12 the turnover duty to provide a safe vessel and that a vessel owner has no legal duty to prevent or
13 alleviate an unsafe condition in the cargo hold resulting from an improper stow when the condition
14 is open and obvious to longshore workers." *Clay v. Daichi Shipping*, 74 F.Supp.2d 665, 671 (E.d.
15 La. 1999). However, the court in *Clay* noted that the open and obvious defense does not absolve
16 ship owners of liability in every circumstance. *Id.* "[O]ne can posit a situation in which a stow is so
17 dangerous that it is virtually impossible to off-load without injury. A vessel owner who participated
18 in such a stow would not likely escape liability." *Id.* Similarly, here, if in fact, as Plaintiff argues,
19 the "failed TL" and connection sockets in the cargo area were so defective as to break and cause
20 cargo containers to fall or swing wildly about, then it is difficult to conceive of how a longshoreman
21 could perform his lashing duties without injury. Moreover, the question of whether the defects were
22 so "obvious" that the longshoremen would notice them is a question of disputed fact.

23 　　　　In short, in light of the factual disputes relating to the circumstances under which the
24 accident occurred in this case, the Court finds that the question of whether the Defendants breached
25 their turnover duty cannot be resolved on summary judgment.

26 　　　　　　　　**b.**　　**The Duty to Intervene**

27 　　　　As stated previously, there is no duty to intervene in stevedoring operations aboard a vessel
28 once such operations have commenced, assuming the shipowner had no knowledge of the defective

11

condition on the vessel. In *Scindia Steam, supra*, the plaintiff longshoreman was injured by cargo that fell from a defective winch. 451 U.S. 156. The plaintiff alleged that the shipowner should have intervened in the ongoing stevedore operations and repaired the winch before allowing the operations to continue. *Id.* The case, therefore, addressed the issue of the scope of the vessel's duty to intervene once the stevedoring operations had begun. *Id.* The Supreme Court held that the duty to intervene once cargo operations have commenced, *assuming the shipowner had no knowledge of the defective condition*, is limited: "[A]bsent contract provision, positive law, or custom to the contrary" a vessel "has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore. *Id.* at 172. An exception to this rule exists where the shipowner: 1) has actual or constructive knowledge of a dangerous condition on the ship; 2) knows that the longshoremen are continuing to work despite the existence of an unreasonable risk of harm to them, and 3) could not reasonably expect that the stevedore would remedy the situation. *Scindia*, 451 U.S. at 175-76.

In the present case, Defendants argue that they had no duty to intervene in the ongoing cargo operations of the stevedore and longshoreman in this case based upon their contention that: 1) there was no unreasonably dangerous condition aboard the ship and 2) the vessel owners had no duty to supervise or inspect the stevedoring operations aboard the ship.

The Court concludes that there are disputed issues of fact that prevent summary adjudication on the issue of whether there was an unreasonably dangerous condition aboard the ship about which the shipowners had knowledge. The parties dispute whether there was a defective condition (the allegedly defective connectors), and whether the shipowner and its crew were aware of the defective condition aboard the ship. As such, there is a dispute regarding the elements of the exception articulated in *Scindia, supra*; *i.e.*, whether the shipowner had actual or constructive knowledge of a dangerous condition aboard the ship, whether the longshoremen were working despite the unreasonable risk of harm, and whether the shipowner could not reasonably expect that the stevedore would remedy the situation. *Scindia,* 451 U.S. at 175-76. As the Supreme Court explained with respect to the facts of the case before it:

> The District Court concluded that there was no triable issue of fact as to whether the shipowner knew or should have known of the alleged condition of the winch. The Court of Appeals read the record quite differently, ruling that there was a disputed material fact, which the District Court should not itself have resolved, with respect to the shipowner's actual or constructive knowledge of the condition of the winch. To the extent that this conclusion was based on the Court of Appeals' erroneous view that the vessel should have known the facts because of its duty to inspect the stevedore's cargo handling operation, it was infirm. But as we understand the opinion below, the Court of Appeals held that there was a triable *issue as to whether the shipowner had actual knowledge of the failure in the winch's braking mechanism or was chargeable with knowledge because the winch was defective from the outset. Based on our own examination of the record, we agree with the Court of Appeals in this respect* and with its conclusion that the District Court erred in granting summary judgment. The case should be returned to the District Court and, if necessary, tried to a jury under appropriate instructions

*Scindia Steam*, 451 U.S. at 178 (emphasis added). Accordingly, to the extent that the claimed violation of the duty to intervene is based on the allegedly defective connectors, summary judgment is DENIED.

Plaintiff's second argument that the Defendants had a duty to inspect or supervise ongoing cargo operations due, in part, to language in the contract between SSA and Hapag-Lloyd in this case is without merit. The contract cited by Plaintiff provides no support for the argument that the Defendants, and not the stevedores, had an ongoing duty to supervise the safety of the cargo operations.[7] The shipowner had no duty to enforce the "five container rule" which, by its terms, was applicable to the longshoremen. To the extent that the claimed violation of the duty to intervene is based on the alleged violation of the five container rule, summary judgment is GRANTED.

### c.  **Active Control Duty**

The also Defendants move for summary judgment on the ground that they did not breach any duty of active control in this case. In order to establish a breach of the active operations duty, a plaintiff must show that the defendant "actively involve[d] itself in the cargo operations and [1] negligently injure[d] a longshoreman, or [failed] to exercise due care to avoid exposing

---

[7]The Supreme Court in *Scindia Steam* rejected the same argument made by Plaintiff here. *See e.g., Scindia Steam,* 415 U.S. 178 ("To the extent that this conclusion [reversing district court] was based on the Court of Appeal's erroneous view that the vessel should have known the facts because of its duty to inspect the stevedore's cargo handling operation, it was infirm."). The Court finds no duty to supervise stevedoring operations in this case. The disputed facts preventing summary judgment on the question of whether there was a duty to intervene concern the disputed facts regarding the unreasonably dangerous condition of the ship *before* stevedoring operations began; not whether dangerous conditions such as failing to adhere to the "five container rule" arose after cargo loading commenced.

13

longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." *Scindia*, 451 U.S. at 167. To give rise to liability under this theory, the Plaintiff must demonstrate that the vessel owner had control over the actual methods and details of the work performed by the longshore worker. Motion at 13 (*citing Taylor v. Moram Agencies*, 739 F.2d 1384, 1387-88 (9th Cir. 1984).

The undisputed evidence in this case demonstrates that the SSA had active control over the operation of the crane as well as the containers involved in the incident in this case. Even viewing the evidence in a light most favorable to Plaintiff, there is no evidence that Defendants were actively involved or controlling the stevedoring operations at port. *See* MacQarrie Decl., ¶ 5, Maeir Decl., ¶ 2; Masungsong Decl., ¶ 2. There has been no argument by Plaintiff with respect to the "active control duty" and therefore the Court finds this portion of Defendants' Motion to be unopposed. Moreover, there has been no evidence presented to the Court that demonstrates that the shipowners had active control over stevedoring operations aboard the vessel in this case. As a result, the Court agrees that the active control duty is inapplicable, and partial summary judgment on this issue is therefore GRANTED.

**IV. CONCLUSION**

For the reasons stated above, Defendants' Motion is GRANTED IN PART AND DENIED IN PART.

IT IS SO ORDERED.

Dated: January 3, 2011

JOSEPH C. SPERO
United States Magistrate Judge